# Exhibit C

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "Agreement") is entered into effective as of the 1st day of April, 2016 by and among MAJOR ENERGY SERVICES, LLC ("MES"), MAJOR ENERGY ELECTRIC SERVICES, LLC ("MEES") and RESPOND POWER, LLC ("Respond" and jointly and severally with MES and MEES, the "Company"), each a New York limited liability company with its principal office as 100 Dutch Hill Road, Suite 310, Orangeburg, New York, 10962, and SAUL HOROWITZ, an individual residing at 21 Rochelle Lane, Spring Valley, New York 10977 (the "Executive"). For purposes of this Agreement, the Company and Executive may be referred to each individually as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS,** the Company desires to retain and employ Executive to provide executive services on behalf of the Company, and Executive desires to be employed by the Company, pursuant to the terms and provisions set forth in this Agreement; and

**WHEREAS,** the Parties desire to document in this Agreement the terms and conditions relating to such services and employment.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **EMPLOYMENT OF EXECUTIVE.**

    1.1. **Duties.** The Company hereby engages Executive as the Senior Advisor of the Company, and Executive hereby accepts such engagement, pursuant to the further terms and provisions of this Agreement. During the term of this Agreement, Executive shall report directly to the Chief Executive Officer of the Company (the "CEO") and shall faithfully perform such duties on behalf of the Company as are typically and routinely associated with such title and position, and shall perform such other duties as Executive and the Company shall mutually determine from time to time.

    1.2. **Time and Effort.** Executive shall devote his time, attention, and reasonable best efforts, during normal working hours, to the business of the Company. Employee shall perform all duties in a professional, ethical and businesslike manner and in furtherance of the policies and directions of the Company. Employee shall operate the Company's business in the ordinary course of business consistent with historical practices. Executive may also participate fully in social, charitable and civic activities, and such other personal affairs and personal business interests of Executive, as do not interfere with the performance of Executive's duties hereunder.

2. **COMPENSATION AND BENEFITS.**

    2.1 **Annual Base Salary.** As compensation for the services rendered by Executive hereunder, the Company shall pay to Executive an annual base salary at the annual rate set forth in the Summary of Executive Compensation set forth in ADDENDUM A attached

hereto and incorporated by reference herein, prorated for calendar year 2016 (the "Base Salary"). Executive's Base Salary shall be payable in equal installments in accordance with the regular payroll practices and procedures of the Company. To the extent required by applicable law, all Base Salary amounts paid hereunder shall be subject to the customary impositions (including, without limitation, state disability insurance), withholding tax and other employment taxes as are required with respect to compensation paid to an employee by an employer.

2.2 **Bonus Compensation**. Executive shall be entitled to participate in all profit-sharing, equity/option, incentive and performance award plans and programs as may from time to time be made available to executives or employees of the Company, as applicable, or as may otherwise be made available to Executive by the Company, which shall include, but shall not be limited to, the Plan set forth on ADDENDUM B attached hereto and incorporated by reference herein. Notwithstanding any provision herein to the contrary, (i) Executive acknowledges and agrees that, as of the Effective Date, the Company has no outstanding obligations under any previous employment agreement (or other employment or other compensation arrangement with the Company), except and as set forth in this Agreement, which is the New Employment Agreement contemplated in that certain Membership Interest Purchase Agreement dated March 18, 2016, effective as of April 1, 2016; and (ii) for the duration of the Earnout Agreement or the separation of Executive's employment with the Companies, whichever shall come first, the Company shall neither (y) terminate or amend any bonus or benefit programs, plan or arrangement of the Company pursuant to which Executive, or his dependents, beneficiaries or estate, is or shall be entitled to benefits pursuant to this Section 2 nor (z) terminate or amend any formula or method set forth in any bonus or benefit program, plan or arrangement of the Company pursuant to which the amount and type of benefits to which the Executive, or his dependents, beneficiaries or estate, is or shall be entitled thereunder are determined, if such termination or amendment would in any way modify or deprive Executive, or his dependents, beneficiaries or estate, of any benefits to which he, or his dependents, beneficiaries or estate, is or shall be entitled under any bonus or benefit program, plan or arrangement of the Company, unless (A) Executive expressly consents in writing to such termination or amendment or (B) the amendment is required by law or regulation and, in such event, the Company shall, to the extent necessary, pay or provide for payment of amounts equal to any benefits lost or reduced by such amendment.

2.3 **Expense Reimbursement**. The Company shall pay or reimburse Executive for all reasonable business expenses actually paid or incurred by Executive in connection with the performance of Executive's duties under this Agreement. Such reimbursement shall be paid or reimbursed in accordance with any and all policies and procedures of the Company (including any parent entity or affiliate, as applicable) applicable to the reimbursement of employee expenses, or as may be otherwise agreed between the Parties. In addition, Executive shall have a company credit card as a means to properly provide receipts to the Company after incurring all expenses.

2.4. **Vacation.** Executive shall be entitled to vacation and other personal leave time (including, without limitation, leave for sickness and temporary disability) during each calendar year hereunder in a manner agreed upon between the Parties. In no event shall Executive be entitled to less than four (4) weeks' vacation plus religious (consistent with Orthodox Jewish practices, as determined by Executive), national and New York State holidays.

In the event Executive does not use all paid vacation time permitted by the Company, Executive shall have the right to carry a maximum of two (2) weeks of paid vacation into the next calendar year. Prior to the start of each calendar year, Executive shall have the option, in lieu of the foregoing, to participate in the paid time off ("PTO") policy of any parent entity of the Company or affiliate of such parent entity or of the Company for the duration of such calendar year, provided that the exercise of such option shall not obligate Executive to participate in such PTO policy for any subsequent calendar year.

2.5. **Additional Benefits.** During the Term (or thereafter, to the extent expressly provided herein), Executive shall receive benefits paid for by the Company in a manner consistent with, or better than, those enjoyed by the Executive prior to the Effective Date. At a minimum, these will include:

2.5.1 Insurance. Health and dental insurance paid by the Company and similar health and welfare benefits and life insurance as may be determined by the Company consistent with such benefits provided to the senior executives of the Company, which, at a minimum, shall include coverage equivalent to the coverage that applied to Executive prior to the Effective Date. In the event that the Company shall provide disability insurance to its senior executives, the Company shall also provide Executive with equivalent disability insurance coverage.

2.5.2 Auto/Insurance. Monthly automobile lease, EZPass tolls and insurance payments consistent with such benefits previously received by Executive.

2.5.3 Retirement Plans. Subject to existing eligibility rules, participation in the Company' Pension/Profit Sharing Plans and other deferral of income plans then made available to the Company' executives.

3. **TERM AND TERMINATION.**

3.1. **Term.** Executive's employment hereunder shall be deemed to have commenced as of the 12:00 A.M., Central Standard Time, on the 1st day of April, 2016 (the "Effective Date") and, unless terminated earlier in accordance with the further provisions of this Agreement, Executive's employment shall continue until December 31, 2018 (the "Initial Term") and shall thereafter automatically renew for successive additional one-year terms (each, a "Renewal Term") unless either Party provides the other with written notice of its intent not to renew this Agreement at least sixty (60) days prior to the end of the Initial Term or Renewal Term, as applicable. For purposes of this Agreement, "Term" shall mean, as applicable, the Initial Term plus any Renewal Terms.

3.2. **Termination.**

(a) **By the Company For Cause.** The Company shall have the right to terminate this Agreement and the Company's employment of Executive, upon the provision of prior written notice to Executive, in the event of the occurrence of any of the following:

(i) Executive commits a material breach of any term or provision of this Agreement, and such breach is not cured by Executive within thirty (30) days following the provision of written notice to Executive by the *Company* specifying the nature of such breach; or

(ii) The Company determines, in good faith, following discussions with Executive providing Executive a reasonable opportunity to explain the underlying facts and circumstances, that Executive has engaged in any of the following actions (provided that the notice of termination shall specify the facts and circumstances giving rise to the termination): (A) Executive has engaged in fraud, gross misconduct, breach of fiduciary obligations, or misappropriated, stolen or embezzled funds or property from the Company, or (B) Executive has been convicted of a felony or entered a felony plea of *"nolo contendre"* or Executive has been convicted of a first degree misdemeanor or entered a plea of *"nolo contendre* to a first degree misdemeanor, which, in the reasonable opinion of the Company, brings Executive into disrepute or is likely to cause material harm to the Company's business, customer or supplier relations, financial condition or prospects, such as, for example and without limitation, a crime of moral turpitude.

(b) **By the Company Upon Disability.** The Company shall have the right to terminate this Agreement and the Company's employment of Executive hereunder upon the provision of at least thirty (30) days' prior written notice to Executive upon a written determination by an independent physician selected by the Company and reasonably acceptable to Executive that Executive is unable to perform Executive's obligations under this Agreement, despite Executive's best efforts, by reason of Disability. As used herein, "Disability" shall mean the inability of Executive, due to a physical or a mental condition, to perform the essential functions of Executive's position, for any period of sixty (60) consecutive days, ninety (90) days in any calendar year, or for an aggregate of one hundred twenty (120) days in any seven hundred twenty (720) day period. For purposes of the foregoing, the return of Executive to his duties for a period of twenty-one (21) days or less shall not be deemed to interrupt or cancel any period of Disability.

(c) **By Executive for Cause.** Executive shall have the right to terminate this Agreement and Executive's employment hereunder: (i) upon the failure of the Company to make any required payment to Executive hereunder, absent legal cause or a bona fide dispute in which event the disputed funds shall be bonded or paid into escrow, which failure is not cured within twenty (20) days following the provision by Executive of written notice to the Company advising of such failure, provided that no notice and opportunity to cure shall be necessary in the event that such failure without legal cause or other mitigating circumstances shall occur more than twice in any consecutive twelve (12) month period; (ii) upon any material breach or default by the Company of any provision of this Agreement (other than a failure to make a required payment as described above), which failure is not cured within thirty (30) days following the provision by Executive of written notice to the Company advising of such failure, or (iii) immediately within thirty (30) days before, or one hundred twenty (120) days after, a "Change in Control" of Company, defined as (i) the acquisition by any person or entity of a beneficial interest, direct or indirect, of fifty percent (50%) or more of the ownership of the Company, (ii) the reorganization, merger or consolidation of the Company with another entity, as a result of which the owners of all beneficial interests in the Company immediately prior to such

merger of consolidation own less than fifty percent (50%) of the voting interests in the surviving entity, (iii) the liquidation or dissolution of the Company or the sale of all or substantially all of the assets of the Company, or (iv) a change in the management of the Company whereby the individuals who, as of the date hereof, constitute the managers of the Company cease for any reason to constitute at least of a majority of the managers, in any case through one transaction or a series of related transactions.  For purposes of clarification, but without limitation, the Parties acknowledge and agree that a material breach by the Company under this Agreement shall include, but shall not be limited to: (w) any demotion or material reduction in the authority of Executive with a reduction in salary and other non-incentive-based compensation, (x) any changes in the reporting structure whereby Executive is required to report to an individual other than the individual serving as CEO as of the Effective Date, (y) any adverse change in the material duties of Executive, where any of the foregoing is substantially inconsistent with Executive's position, title and duties immediately prior to the applicable change, and (z) any involuntary relocation by the Company of Executive's office to a place more than twenty (20) miles from Orangeburg New York, unless in each case such cause or condition constituting a material breach is expressly waived or otherwise agreed to in writing, including any electronic transmission.

(d) **Death of Executive.**  This Agreement and the employment of Executive hereunder shall terminate upon the death of Executive.

(e) **By Either Party Without Cause**.  Either Party may terminate this Agreement at any time without cause upon one hundred eighty (180) days' notice to the other Party.

3.3. **Payments and Benefits Following Termination.**

(a) In the event of: (i) the termination of this Agreement (or any renewal of this Agreement) for any reason other than a termination by the Company pursuant to Section 3.2(a) or a termination by Executive pursuant to Section 3.2(e), or (ii) the election by the Company, pursuant to Section 3.1 hereof, not to renew the term of this Agreement, the Company shall pay to Executive (or to his estate, as applicable), as severance pay (the "Severance"), an amount equal to two hundred (200%) percent of the average annual compensation paid to Executive by the Company (including, without limitation, Base Salary and any bonus compensation paid to Executive) averaged over the twenty-four (24) full calendar months immediately preceding the effective date of expiration or termination or the period commencing as of the Effective Date, whichever period is less.  The Severance shall be paid over a 24 month period immediately following the effective date of expiration or termination.

(b) In addition to the Severance, in the event that this Agreement is terminated for any reason or not renewed, the Company shall also pay to Executive (or to Executive's estate or designated benefit beneficiaries, as applicable), not later than thirty (30) days following such expiration or termination: (i) a lump-sum amount equal to the sum of Executive's earned and unpaid salary, if any, through the effective date of expiration or termination; (ii) any bonus earned by Executive with respect to periods prior to the expiration or termination, but not yet paid to Executive as of the effective date of expiration or termination;

(iii) a prorated portion (based on the number of days employed in the fiscal year during which the effective date of termination occurs) of any bonus previously committed by the Company to Executive with respect to periods following the expiration or termination, which bonus, if any, will be paid at the same time that bonuses are paid to other Company executives for the fiscal year in which the expiration or termination occurs; (iv) any unreimbursed business and entertainment expenses; (v) any unreimbursed employee benefit expenses that are reimbursable in accordance with the Company's policies, procedures or employee benefit plans through the date of termination; and (vi) death or disability benefits, if any, under and in accordance with the Company's employee benefit plans.

(c) In addition to the foregoing, in the event of: (i) the termination of this Agreement (or any renewal of this Agreement) for any reason other than a termination by the Company pursuant to Section 3.2(a) or a termination by Executive pursuant to Section 3.2(e), or (ii) the election by the Company, pursuant to Section 3.1 hereof, not to renew the term of this Agreement,, the Executive shall continue during the Benefits Continuation Period (as hereinafter defined) to be treated as an executive under all of the bonus and benefit programs, plans or arrangements of the Company in accordance with the terms of Section 2.2 (but not including the Incentive Bonus Plans) and Section 2.5 of this Agreement, including, without limitation, coverage, at the Company's expense (including without limitation through the payment of amounts in connection with Executive's election under the Consolidated Omnibus Budget Reconciliation Act, if applicable), under the Company's medical, dental, life insurance and disability benefit plans or arrangements, and Executive shall continue to be entitled to all benefits and service credits for benefits under any such benefit programs, plans or arrangements as if he were still employed on a full-time basis during such period under this Agreement; provided, however, if benefits or service credits for benefits under any such benefit program, plan or arrangement of the Company shall not be payable or provided under any such benefit program, plan or arrangement to the Executive, or his dependents, beneficiaries or estate, because he is no longer an employee of the Company, the Company shall, to the extent necessary, pay or provide for payment of equivalent benefits and service credits for such benefits to the Executive, his dependents, beneficiaries or estate.  Notwithstanding anything to the contrary contained in this Section 3.3(c), the Executive may elect, within thirty (30) days after his termination as described in the first sentence of this Section 3.3(c), to be paid a lump sum or other agreed severance allowance in cash in lieu of the Executive's continued participation in the benefit programs, plans or arrangements of the Company as provided for herein.  For purposes of this Section, the term "Benefits Continuation Period" shall mean the period beginning upon the termination or non-renewal, as applicable, of this Agreement and ending on the later of: (i) the last day of the Initial Term or the then-current Renewal Term, as applicable, or (ii) the date that is eighteen (18) months following the effective date of such expiration or termination. Until the effective date of any expiration or termination of this Agreement (other than for death or Disability), Executive shall continue to perform the normal duties of his employment hereunder (unless waived by the Company), and shall be entitled to receive when due all compensation and benefits applicable to Executive hereunder. Executive shall have no duty to mitigate his damages, and the amounts due Executive under this Section 3.3 shall not be reduced by any payments received from other sources.

(d) Payments made pursuant to Section 3 hereunder are in the nature of

severance and/or liquidated damages. Executive is under no obligation to mitigate these damages.

### 3.4. **Effects of Termination.**

For a period of two (2) years following any expiration or termination of this Agreement, the Company and Executive shall not engage in any actions that could reasonably be deemed to disparage or criticize the other or the services rendered by Executive on behalf of the Company, and the Company shall not engage in any other action that injures or hinders the business opportunities of Executive; provided that: (i) the foregoing shall not be deemed to prohibit the Company from exercising any rights that the Company may have under this Agreement, or from complying with any legal obligations or any requirements of any governmental or judicial authorities with appropriate jurisdiction; and (ii) the foregoing shall not be deemed to require the Company to make any false statements or disclosures. Executive, as a non-exclusive remedy, shall be entitled to injunctive relief to prevent any breach by the Company of its obligations under this paragraph.

### 4. **CONFIDENTIALITY; NON-SOLICITATION.**

4.1. The Executive acknowledge that he has acquired and will acquire confidential information respecting the business of the Company and its affiliates. Accordingly, the Executive shall not disclose, at any time (during his employment under this Agreement or thereafter), any such confidential information, other than in connection with the performance of his duties under this Agreement; provided that Executive shall not be restricted from disclosing any information that is required to be disclosed pursuant to the requirements of applicable law or process issued in connection with any judicial or administrative proceeding.

4.2. For a period of two (2) years after Executive's employment with Company expires or terminates for any reason, Executive will not intentionally solicit customers of the Company. The provisions of this Section 4.2 shall not apply to any inadvertent or unintentional solicitation of Company's customers as long as Executive has not intentionally targeted, either directly or indirectly, Company's customers.

### 5. **MISCELLANEOUS.**

5.1. This Agreement may not be changed, modified or amended except by a subsequent writing signed by the Parties, and this Agreement may not be discharged except by performance in accordance with its terms or by a writing signed by the Party to be charged.

5.2. This Agreement sets forth the entire agreement and understanding between the Parties as to the matters contained herein, and merges and supersedes all prior discussions, agreements and understandings of every kind and nature among them; provided that, except as specifically addressed in this Agreement, this Agreement is not intended to supersede or cancel the Operating Agreement. No Party shall be bound by any condition, definition, warranty, or representation other than as expressly provided for in this Agreement.

5.3. This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective heirs, executors, estates, legal representatives, successors and permitted assigns. This Agreement and a Party's rights and obligations herein may not be assigned or delegated by a Party without the prior written consent of the other Party.

5.4. All notices, requests, demands, and other communications required or permitted by this Agreement shall be in writing and (unless otherwise specifically provided herein) sent to the addresses first set forth above (or to such other addresses as may be designated by a Party to the other Party, provided that notice of change of address shall be valid only upon receipt), and shall be deemed to have been received: (i) three (3) days after deposit in the U.S. mail, postage prepaid, registered or certified, return receipt requested; or (ii) one (1) day after deposit with a nationally recognized overnight delivery or overnight courier service. All notices may be given by the attorneys for the Parties with the same force and effect as if given by the Parties themselves.

5.5. If any provision of this Agreement or the application of any provision hereof to any person or circumstance is held invalid, then the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement.

5.6. This Agreement is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, to avoid the consequences of plan failures as set forth in Code Section 409A(a)(1). Any terms of the Agreement that conflict with such guidance shall be null and void, subject to the next sentence. To the extent necessary or advisable, the Parties agree to amend the Agreement to modify any conflicting provisions and to add such other provisions as are required to fully comply with the applicable provisions of Section 409A and any other legislative or regulatory requirements applicable to the Agreement, such that the modified and additional provisions shall preserve to the maximum extent possible the benefits and obligations intended by the Parties hereunder.

5.7. This Agreement shall be governed by and construed under the internal laws of the State of New York, without giving effect to the principles of conflicts or choice of laws.

5.8. The headings of the Sections hereof are inserted only for the convenience of the Parties and in no way define, limit or prescribe the intent of this Agreement.

5.9. Whenever used herein and required by the context, the singular number shall include the plural, the plural shall include the singular number, and the use of either gender shall include both genders and the neuter, and the words "hereof" and "herein" and "hereinafter" and "hereto" shall refer to this entire Agreement and not to any provision, paragraph, subparagraph or section.

5.10. The waiver by either Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach

or violation of the same or another provision hereof.

    5.11. Each Party and its counsel have had the opportunity to participate fully in the review and development of this Agreement. In interpreting this Agreement, any rules of construction that favor the non-drafting Party shall not apply.

    5.12. The non-prevailing Party in any litigation relating to the terms and provisions of this Agreement (including, without limitation, the enforcement by Executive of the provisions of Section 3.3 above) shall be obligated to pay to the prevailing Party the reasonable costs and expenses (including, without limitation, legal fees and court costs) incurred by the prevailing Party in connection with such litigation.

    5.13. This Agreement may be executed in counterparts, and by electronic (.pdf) execution and transmission thereof, and each such counterpart shall for all purposes be deemed to be an original. All of such counterparts together shall constitute one and the same instrument.

*[signatures on the following page]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**COMPANY**:

**MAJOR ENERGY SERVICES, LLC**

By: *[signature]*
Name: Daniel Alper, CEO
Date:

**MAJOR ENERGY ELECTRIC SERVICES, LLC**

By: *[signature]*
Name: Daniel Alper, CEO
Date:

**RESPOND POWER, LLC**

By: *[signature]*
Name: Daniel Alper
Date:

**EXECUTIVE**:

*[signature]*
SAUL HOROWITZ

# ADDENDUM A

## SUMMARY OF EXECUTIVE COMPENSATION

| | |
|---|---|
| **EXECUTIVE:** | Saul Horowitz |
| **ADDRESS:** | 21 Rochelle Lane<br>Spring Valley, New York |
| **COMPANIES:** | Major Energy Services LLC<br>Major Energy Electric Services LLC<br>Respond Power LLC |
| **TITLE FOR EACH COMPANY:** | Senior Adviser |
| **JOB LOCATION:** | 100 Dutch Hill Road, Suite 310, Orangeburg, NY 10962 |
| **EFFECTIVE DATE:** | April 1, 2016 |
| **ANNUAL SALARY:** | $250,000 |

# ADDENDUM B

Incentive Bonus Plans

As set forth in Section 2.2 of this Agreement, Executive shall be entitled to participate in the Annual Bonus as set forth below.

Annual Bonuses.

1. Executive shall be eligible for an Annual Bonus under the Executive – Short Term Incentive Plan ("E-STIP") of the Company based on achievement, in the determination of the Executive Committee, in their sole but reasonable discretion, of standards of performance agreed upon by Executive and the Compensation Committee of the Company (as defined in the E-STIP) for each Employment Year (hereinafter defined), which may include, but shall not be limited to, meeting or exceeding EBITDA targets, reducing customer churn, and originating and closing value added transactions. For each Employment Year, the Annual Bonus shall be targeted to be Fifty Percent (50%) of Executive's Base Salary for such Employment Year. For purposes of this Agreement, "Employment Year" shall mean any calendar year at any point during which Executive is employed by the Company hereunder, subject to proportionate reduction for any period less than a full calendar year.

2. The Annual Bonus for any Employment Year shall be paid to Executive within one-hundred twenty (120) days after the end of each Employment Year, provided that if Executive's employment hereunder is terminated for any reason hereunder prior to the last day of a calendar year, then the last day of the last Employment Year hereunder shall be the last day of Executive's employment hereunder.